UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH PFEISTER,<br><br>    Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>    Defendant. | Case No. 17-cv-03573-DMR<br><br>**ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Re: Dkt. No. 12 |

Plaintiff Joseph Pfeister filed a complaint against Defendant International Business Machines Corporation ("IBM") on May 23, 2017, which IBM removed to this court on June 21, 2017. IBM now moves pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. [Docket No. 12.] This matter is suitable for resolution without a hearing. *See* Civ. L.R. 7-1(b). For the following reasons, IBM's motion is granted in part and denied in part.

## I. BACKGROUND

Pfeister makes the following allegations in his complaint. Pfeister worked for IBM as an Industry Client Leader from October 2007 until January 2017. Compl. ¶ 6. In addition to his salary, Pfeister could earn incentive compensation pursuant to the IBM Incentive Plan. *Id*. at ¶¶ 6, 7. Under the Incentive Plan, Pfeister had four separate "quota measurements," one of which was "signings." IBM originally set Pfeister's signings quota for the fourth quarter of 2016 at approximately $3.5 million. *Id*. at ¶ 7. In December 2016, IBM lowered that signings quota to $2,817,251.00. *Id*. at ¶ 8.

Attached as Exhibit A to the complaint is a copy of Pfeister's "revised [Incentive] Plan." Compl. ¶ 8, Ex. A (Incentive Plan). The six-page document, titled "Field Management System," is divided into four sections: "Letter dates/status," which includes Pfeister's offer and acceptance

dates; "Employee details," which contains basic information about Pfeister, including his organization, business unit, and supervisor's name; "Plan details," which provides the plan start and end date; and "Incentive element details." The "Incentive element details" section sets forth Pfeister's four individual quotas, including the $2,817,251.00 "signings" quota.

In addition, the Incentive Plan contains a section labeled "Other Important Information," which includes a "Right to Modify or Cancel" provision that states in relevant part:

> **Right to Modify or Cancel:** The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it. IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives (including management-assessment objectives), changes to assigned customers, territories, or account opportunities, or changes to applicable incentive payment rates or quotas, target incentives or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related payments have been earned under the Plan terms. . . .

Incentive Plan 4. The Incentive Plan also contains provisions which give IBM "sole discretion" to adjust incentive payments, as follows:

> **Adjustments for Errors:** IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. . . .
>
> . . .
>
> **Significant Transactions:** IBM reserves the right to review and, in its sole discretion, adjust incentive achievement and/or related payments associated with a transaction which (1) is disproportionate when compared with the territory opportunity anticipated during account planning and used for the setting of any sales objectives; or for which (2) the incentive payments are disproportionate when compared with your performance contribution towards the transaction.

Incentive Plan 4, 5.

Based on Pfeister's efforts in the fourth quarter of 2016, IBM realized signings revenue of $26,063,679.00. Pfeister alleges that this result entitled him to a commission of $462,653.00 based on his quota and the terms of the plan. However, IBM has refused to pay Pfeister that sum. *Id*. at ¶ 9. On February 13, 2017, Pfeister's supervisor, Christian Blechinger, contacted Pfeister to

2

1  inform him that IBM had changed his signings quota to $10,000,000, which had the effect of
2  reducing Pfeister's commission to $97,444.49. Pfeister alleges that Blechinger provided shifting
3  explanations for the change and that IBM has never documented the details allegedly supporting
4  the change. *Id*. at ¶ 12.

5  On March 20, 2017, Pfeister received an email from an IBM analyst stating, "Please
6  consider the attached file below as notification that your incentive record is formally closed." *Id*.
7  at ¶ 13. The attachment included a record confirming Pfeister's $2,817,251 signings quota, as
8  well as a "settlement letter" stating that Pfeister had a "Credit Balance of $92,769.69 that had been
9  forwarded to his home." The letter conditioned Pfeister's receipt of the $92,769.69 as follows:
10 "By accepting this payment, you acknowledge and agree that this net amount is the final
11 commissions due to you from IBM." *Id*. at ¶ 13. Pfeister "refused to forfeit the balance of the
12 commission owed to him and, as a result, did not negotiate the check provided by IBM." *Id*. IBM
13 has not paid any of Pfeister's signings commission for the fourth quarter of 2016. *Id*. at ¶ 15.

14 Pfeister alleges three claims for relief: 1) breach of contract, based on IBM's breach of its
15 obligation to pay Pfeister commissions due under the Incentive Plan in the amount of
16 $462,653.00; 2) violation of California Labor Code section 204, based on IBM's failure to pay
17 outstanding wages in the amount of $462,653.00; and 3) violation of California Labor Code
18 section 202, based on IBM's failure to timely pay wages. IBM now moves for judgment on the
19 pleadings as to all three claims.

20 **II.    LEGAL STANDARD**

21 "After the pleadings are closed—but early enough not to delay trial—a party may move for
22 judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings
23 "challenges the legal sufficiency of the opposing party's pleadings." William Schwarzer et al,
24 *Federal Civil Procedure Before Trial* ¶ 9:316 (2014). "Rule 12(c) is functionally identical to Rule
25 12(b)(6) and . . . the same standard of review applies to motions brought under either rule."
26 *Cafasso, U.S. ex rel. v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).
27 Thus, a judgment on the pleadings is appropriate when the pleaded facts, accepted as true and
28 viewed in the light most favorable to the non-moving party, entitle the moving party to a judgment

3

as a matter of law. *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1301 (9th Cir. 1992); *see also Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

**III. DISCUSSION**

**A. Breach of Contract Claim**

IBM argues that it is entitled to judgment on Pfeister's breach of contract claim because the Incentive Plan does not constitute an enforceable contract that would require IBM to pay Pfeister any specific amount of commissions.

In order to prevail on a claim for breach of contract, a plaintiff must first establish the existence of a contract. The essential elements of a contract under California law are "(1) '[p]arties capable of contracting;' (2) '[t]heir consent;' (3) '[a] lawful object;' and (4) '[s]ufficient cause or consideration.'" *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (alterations in original) (quoting Cal. Civ. Code § 1550). As to the second element, "[c]ontract formation requires mutual consent, which cannot exist unless the parties agree on the same thing in the same sense." *Bustamante v. Intuit, Inc.,* 141 Cal. App. 4th 199, 208 (2006) (quotations omitted); *see also Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996) ("[p]arties must communicate their mutual consent to enter into a contract."). Additionally, a contract must be sufficiently definite, so that the court may "ascertain the parties' obligations and . . . determine whether those obligations have been performed or breached." *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 623 (1991).

Pfeister's breach of contract claim fails because the Incentive Plan is not an enforceable contract. First, Pfeister cannot show the mutual assent or consent of the parties to enter into a contract. "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Pac. Corp. Grp. Holdings, LLC v. Keck*, 232 Cal. App. 4th 294, 309 (2014) (citation omitted). The test is "what the outward manifestations of consent would lead a reasonable person to believe." *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998). "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no

4

contract formation." *Id*. (citing Cal. Civ. Code §§ 1550, 1565 & 1580). Here, the Incentive Plan expressly denies IBM's intent to form a contract. The "Right to Modify or Cancel" clause states that the Incentive Plan "does not constitute an express or implied contract or a promise by IBM to make any distributions under it." Incentive Plan at 3. The "reasonable meaning" of this clear and unequivocal language establishes that IBM did not consent to form a contract with Pfeister.

Numerous courts have examined identical or substantially similar language in IBM's incentive plans and have concluded that such language precludes contract formation. For example, in *Schwarzkopf v. International Business Machines, Inc.*, No. C 08-2715 JF (HRL), 2010 WL 1929625, at *1 (N.D. Cal. May 12, 2010), the plaintiff brought a breach of contract claim to enforce a "Quota Letter" that described the details of IBM's employee incentive plan. The Quota Letter contained "Right to Modify or Cancel" and "Significant Transactions" clauses that were nearly identical to the clauses in Pfeister's Incentive Plan. *Id*. The court noted that the "unambiguous, express terms of the Quota Letter explicitly deny any intent to contract," and held that "[a]ny inferences that may be drawn in [the plaintiff's] favor with respect to the circumstances or intent of the Quota Letter are insufficient to negate IBM's clear intent *not* to contract, or its express reservation of discretion that inevitably limits any implied understanding of a promise to pay commission in full." *Id*. at *7-8 (emphasis in original). In *Jensen v. International Business Machines Corp.*, 454 F.3d 382, 388 (4th Cir. 2006), the Fourth Circuit reached the same conclusion with respect to an IBM sales incentive plan that contained similar disclaiming language. The plan at issue contained the statement that "[w]hile IBM's intent is to pay employees covered by this program according to its provisions, this program does not constitute a promise by IBM to make any distributions under it." *Id*. at 388. The court held that "[b]y this language, IBM did not invite a bargain or manifest a 'willingness to enter into a bargain.' To the contrary, it manifested its clear intent to preclude the formation of a contract." *Id*. While the court in *Jensen* examined the plan under Virginia law, it noted that "the principles of Virginia law are representative of contract law generally." *Id*. at 387. *See also Gilmour v. International Business Machines Corp.*, No. CV 09-04155 SJO (AGRx), 2009 WL 8712153, at *2 (C.D. Cal. Dec. 16, 2009) (finding no contract because IBM incentive plan did not manifest "IBM's 'willingness to

5

enter into a bargain' [and] allow[ed] IBM to . . . unilaterally modify or terminate the Plan at any time"); *Kemp v. International Business Machines Corp.*, No. C-09-4683 MHP, 2010 WL 4698490, at *5 (N.D. Cal. Nov. 8, 2010) (holding that plaintiff had failed to state a claim for unpaid commissions premised on IBM incentive plan in part because it was not an enforceable contract).

Additionally, the Incentive Plan does not satisfy the contractual requirement of sufficiently definite terms. "In order for acceptance of a proposal to result in the formation of a contract, the proposal must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain." *Weddington Prods*, 60 Cal. App. 4th at 811 (quotation omitted). "The terms of a contract are reasonably certain if they provide a basis for determining . . . the existence of a breach and for giving an appropriate remedy. If, by contrast, a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract." *Id*. (quotation omitted). The Incentive Plan contains numerous reservations of rights by IBM, including the Right to Modify or Cancel Clause, which permits IBM in its sole discretion to change sales performance objectives and "applicable incentive payment rates or quotas, target incentives or similar earnings opportunities." Similarly, the Significant Transactions and Adjustments for Errors clauses reserve the right of IBM in its sole discretion to adjust the incentive payment for "significant transactions" or "errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives." Incentive Plan 4, 5. As the court in *Schwartzkopf* held, IBM's reservations of rights in these provisions "create indefinite terms that provide little guidance for enforcement." 2010 WL 1929625, at *7; *see also Jensen*, 454 F.3d at 388 (provision allowing IBM to modify or cancel incentive plan at any time before payment "made clear that there were no conditions that [the plaintiff] could satisfy to create a binding contract *before IBM decided to pay him*." (emphasis in original)).

Pfeister does not address the requirements for contract formation in his opposition. He also does not cite any authority supporting his position that he formed an enforceable contract with

6

IBM despite the lack of mutual consent or sufficiently definite terms, and does not meaningfully grapple with the reasoning in *Schwarzkopf* and *Jensen*. Instead, Pfeister asserts that the court in *Schwarzkopf* held that "contract formation does not occur when an employer retains absolute discretion or a unilateral right to modify or cancel employee commission," and argues that this statement contradicts California law, citing *Asmus v. Pacific Bell*, 23 Cal. 4th 1, 16 (2000). Opp'n 6 (quoting *Schwarzkopf*, 2010 WL 1929625, at *8). This argument is not persuasive. To begin with, Pfeister's selective quote from *Schwarzkopf* is misleading and does not accurately state the court's holding. Although the court cited "[c]ases from other jurisdictions [which] generally reinforce the conclusion that contract formation does not occur when an employer retains absolute discretion or a unilateral right to modify or cancel employee commission," it also discussed other cases holding the opposite, that is, cases in which courts have found the existence of "an enforceable contract notwithstanding the employer's discretion to modify or alter a commission arrangement." *Schwarzkopf*, 2010 WL 1929625, at *8. In the end analysis, the *Schwarzkopf* court based its determination that there was no enforceable contract primarily on the lack of mutual consent and sufficiently definite terms. *See id*. at *5-9.

Moreover, *Asmus* is inapposite. In that case, the California Supreme Court addressed the following issue: "Once an employer's unilaterally adopted policy—which requires employees to be retained so long as a specified condition does not occur—has become a part of the employment contract, may the employer thereafter unilaterally [terminate] the policy, even though the specified condition has not occurred?" 23 Cal. 4th at 5-6. In *Asmus*, Pacific Bell issued a policy in 1986 that it would "offer all management employees . . . employment security through reassignment to and retraining for other management positions, even if their present jobs [were] eliminated," and stated that it would maintain the policy "so long as there [was] no change that [would] materially affect Pacific Bell's business plan achievement." *Id*. at 7. In 1990, it notified its managers of the possibility that it would discontinue the policy, and in October 1991, announced that it would terminate the policy in April 1992. *Id*. The plaintiffs were 60 former Pacific Bell management employees who were affected by the cancellation. Both sides agreed that the employment policy had become unilateral implied-in-fact contracts which the employees accepted by continuing their

7

employment, but disagreed about how Pacific Bell could terminate or modify those contracts. *Id*. at 11. Applying contract law, the court held that "[a]n employer may terminate a written employment security policy that contains a specified condition, if the condition is one of indefinite duration and the employer makes the change after a reasonable time, on reasonable notice, and without interfering with the employees' vested benefits." *Id*. at 18.

Pfeister argues that the Incentive Plan is like the policy at issue in *Asmus*, and that IBM "cannot change this type of policy without reasonable notice and time and without protected benefits already earned and vested under the policy." Opp'n 7. Notwithstanding the fact that the Pacific Bell policy was not a discretionary incentive plan like the one at issue here, Pfeister had no vested rights to any specific amount of incentive pay under the Incentive Plan, since the plan reserved to IBM the right to determine how much it would pay him and the right to adjust incentive payments. Further, the decision in *Asmus* was grounded in principles of contract law based on the fact that the policy undisputedly was a unilateral contract between the employer and its employees. *See Asmus*, 23 Cal. 4th at 11-18. As discussed above, Pfeister did not form an enforceable contract with IBM given the lack of mutual consent and sufficiently definite terms.

Pfeister also argues that this case is similar to *Moncada v. West Coast Quartz Corporation*, 221 Cal. App. 4th 768, 777 (2013). In *Moncada*, the defendant owners and shareholders were pursuing the sale of their company. They repeatedly promised their employees that if they stayed and continued to work until the sale, they would pay the employees a bonus from the sale proceeds that would be sufficient for them to retire. Following the sale of the company, the defendants never paid the employees the promised bonus. *Id*. at 772-74. The employees sued, claiming breach of contract. In reversing the trial court's order sustaining the defendants' demurrer, the court rejected the defendants' argument that the promise to pay bonuses was vague and unenforceable. The court concluded that a "court or jury could easily determine if defendants failed to meet this obligation by evaluating whether such bonus was paid" and could determine the plaintiffs' damages by "using standard formulae and actuarial tables" to determine bonus amounts that would be sufficient for plaintiffs to retire. *Id*. at 777-78. *Moncada* is distinguishable, because here, the Incentive Plan expressly provided that IBM reserved the right to determine the amount of

the bonus or incentive pay it would pay to Pfeister.

Finally, Pfeister argues that the court should deny IBM's motion because the provisions of the Incentive Plan allowing IBM discretion to adjust or modify the terms of the plan are unconscionable, citing California Civil Code section 1670.5(a), which discusses unconscionable contracts:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

Cal. Civ. Code § 1670.5(a). This statute is inapplicable, for it applies to contracts, and as discussed above, the Incentive Plan is not an enforceable contract as a matter of law. The cases Pfeister cites in support of this argument are similarly inapposite, as they involve written employment contracts. *See, e.g., Ellis v. McKinnon Broad. Co.*, 18 Cal. App. 4th 1796, 1804-05 (1993) (commission forfeiture provision in employment contract held unenforceable); *McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1144, 1152 (N.D. Cal. 2002) (noting that it was "undisputed that [sales incentive compensation plan] [was] enforceable as a contract" between the parties; finding disputes of fact regarding whether plan was procedurally and substantively unconscionable).

The court concludes that Pfeister's Incentive Plan is not an enforceable contract, and dismisses Pfeister's breach of contract claim with prejudice.

### B. California Labor Code Claims

IBM argues that it is also entitled to judgment on Pfeister's claims under California Labor Code sections 202 and 204, asserting that Pfeister "does not have a right to any of the sums he claims in this matter." Mot. 10. Pfeister counters that IBM has conceded that it owes him $92,769.69 in incentive pay, and argues that his claims for the timely payment of this undisputed sum without precondition should not be dismissed. Opp'n 3. The court agrees that Pfeister has sufficiently pleaded these claims. Accordingly, the court denies IBM's motion for judgment on the pleadings with respect to Pfeister's second and third claims for relief.

### C. Pfeister's Request for Leave to Amend the Complaint

Pfeister requests leave to amend his complaint to add claims for breach of the implied covenant of good faith and fair dealing, estoppel, implied contract, and violation of California Business & Professions Code section 17200 *et seq*. Opp'n 13-14. This request is denied without prejudice to filing a regularly-noticed motion for leave to file an amended complaint, if the parties are unable to stipulate to such an amendment. Any such motion shall comply with the Local Rules, including Local Rule 10-1, which requires any party moving to file an amended pleading to "reproduce the entire proposed pleading" and prohibits "incorporate[ing] any part of a prior pleading by reference."

## IV. CONCLUSION

For the foregoing reasons, IBM's motion for judgment on the pleadings is granted in part and denied in part. Pfeister's breach of contract claim is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: October 16, 2017



_____
Donna M. Ryu
United States Magistrate Judge